# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Robert A. Ries, | Civ. No. 10-1715 (JNE/JJK) |
| Plaintiff, | |
| v. | |
| Winona County, | **REPORT AND** |
| | **RECOMMENDATION** |
| Defendant. | |

Robert A. Ries, 23844 Westwood Road, Trempealeau, WI 54661, *pro se*.

Mary A. Rice, Esq., Fafinski Mark & Johnson, PA, counsel for Defendant.

JEFFREY J. KEYES, United States Magistrate Judge

This matter is before the Court on Plaintiff's and Defendant's cross-motions for summary judgment.  (Doc. Nos. 67 and 81.)  These motions have been referred to this Court for a Report and Recommendation under 28 U.S.C. § 636 and D. Minn. Loc. R. 72.1.  For the reasons stated below, this Court recommends that Defendant's motion for summary judgment be granted, Plaintiff's summary judgment be denied, and this case be dismissed with prejudice against Plaintiff.

## INTRODUCTION

In this employment discrimination action, Plaintiff alleges that he was denied employment because of his gender and/or age.  Plaintiff applied for the position of License Center Clerk II, in Winona County's License Center, a job

which entails performing, among other things, title transfers in the sale or transfer of ownership of vehicles.  He was not selected for an interview and was thus not hired.  As evidence of disparate treatment, Plaintiff relies on hiring statistics and the manner in which Defendant scored his job application.  Specifically, he complains that Defendant erred in scoring his application by awarding him no points in the categories of license and money experience.

Winona County ("Defendant") counters that there is no admissible evidence that supports a claim of discrimination based on age, under the Age Discrimination in Employment Act ("ADEA"), or gender, under Title VII of the Civil Rights Act of 1964 ("Title VII"), because Defendant clearly had a legitimate, nondiscriminatory reason for its interview selection and hiring decisions:  the successful candidates had superior qualifications for the position.   Further, Defendant argues that its hiring statistics are gender neutral because the gender of those hired was not statistically significantly different from what would be expected in a gender neutral hiring process, given the gender of the applicants.  As to age, Defendant notes that two of the four hires were 58-years old on the date of hire, and only one hire was under the age of forty.   In sum, Defendant submits that there are no genuine issues of material fact that its hiring decision was not pre-textual or tainted by considerations of age or sex.   Both parties cross-moved for summary judgment.  (Doc. Nos. 67 and 81.)  For the reasons set forth below, this Court recommends that Defendant's summary judgment motion be granted and Plaintiff's denied.

## FACTUAL BACKGROUND

On September 26, 2008, an opening for the Clerk II, License Center position was externally posted by Defendant, and was advertised in the local newspaper and elsewhere.  (Doc. No. 74, Affidavit of Maureen Holte ("Holte Aff.") ¶ 6.)  In response to the posting, forty-three people applied, including Plaintiff.  Of the forty-three applicants, eight were male.  (*Id.* ¶ 19, Ex. N.)  Plaintiff was 66-years old when he applied for the position.

### The Initial Application Process

Plaintiff applied for the License Clerk II position after having been provided with an application and the job posting.  (Doc. No. 73, Affidavit of Mary Rice ("Rice Aff.") ¶ 2, Ex. A, at 21.)   The application instructed in relevant part:

> 2. Give complete and accurate information. If the information is incomplete and/or inaccurate you may receive an imprecise score or be removed from further consideration.
>
> 3. Work Experience Section: Be specific and complete. . . .
>
> * * * *
>
> 7. Resumes may be included but will not be accepted in place of an application.
>
> Do not write "see resume" on the application form.

(*Id.* ¶ 4, Ex. C.)  The application advised Plaintiff that if the information is incomplete or inaccurate, he may receive an imprecise score or be removed from further consideration.  (*Id.*)  Plaintiff read the instructions.  (*Id.* ¶ 2, Ex. A at 20 – 22.)   Nonetheless, Plaintiff disregarded the instructions, writing "See Resume" in

some areas, and nothing at all in other areas (e.g., the education section), simply

attaching his resume.[1]  (*Id.* ¶ 4, Ex. C.)  Despite its shortcomings, Plaintiff's

application was reviewed and scored by Defendant.  (Doc. No. 82, Supplemental

Affidavit of Mary Rice ("Rice Supp. Aff."), Ex. A. at 22.)

Before any resumes were received, and in preparation for the initiation of

the hiring process, Cherie MacLennan, the County Auditor, prepared a set of

criteria by which the applications would be scored, and assigned points for each,

creating a point spreadsheet. (Doc. No. 78, Affidavit of Cherie J. MacLennan

("MacLennan Aff.") ¶¶ 11 and 12, Exs. G and H.)  Personnel Director Maureen

Holte reviewed and approved them.  (Doc. No. 74, Holte Aff. ¶ 8.)  She also

prepared a list of interview questions. When MacLennan prepared these

materials she did not know anything about the prospective applicants.

(MacLennan Aff. ¶ 11.)  She submitted the point spreadsheet and interview

questions to Holte, who reviewed and approved them.  The categories and the

corresponding points were based on what MacLennan believed to be the most

important experience and knowledge for the job.  They were as follows:

   a.   License experience: 25 possible points, with 25 points available for
        work experience within the last three years, 15 for work experience

---

[1]      In his application Plaintiff also indicated that he had never been fired from
a job.  (Rice Supp. Aff., Ex. A. at 24--25.)  But it appears that that he was
involuntarily terminated from at least one job, and then sued his former employer
because of it.  (*Id.*)  Nonetheless, on the signature page of the application,
Plaintiff certified that all of his statements were true and correct, and that any
falsification would disqualify him from employment.  (*Id.*)

within the last five years, and 10 for work experience in a related field.

b.    Customer service experience: 25 possible points, with 25 points available for ten years of customer service experience, 15 for five to nine years experience, and 5 for one to four years experience.

c.    Computer experience:  25 possible points, with 20 points available for work-related computer experience, and an additional 5 available for personal or home experience.

d.    Communications: 20 possible points, with 20 points available for direct public contact, an additional 10 available for indirect public contact, and an additional five available for written public contact.

e.    Money transactions: 15 possible points, with 10 points available for cashier transaction experience, and five available for banking or deposit experience.

f.    Veteran's preference:  10 possible points.

(MacLennan Aff. ¶ 12 and Ex. H.)  Defendant then placed newspaper ads seeking applications for the open position.  (Holte Aff. ¶ 9 and Ex. D.)  After the application deadline, the applications were given to MacLennan, who scored them based on the point spreadsheet.  (MacLennan Aff. ¶ 13.)  She reviewed each application twice and assigned points.  (*Id.*)  She was unaware of the applicants' age when she reviewed the applications.  (*Id.*)  After MacLennan completed the scoring, she provided the score sheet and applications to Holte, who spot-checked them.  (Holte Aff. ¶ 11.)  They appeared to be in order, and the top three candidates were chosen for interviews.  (MacLennan Aff. ¶ 25.)  The top three were chosen because MacLennan was very impressed with each of their applications, and believed that a good hire could be made from those

three applicants.  (*Id.*)  Plaintiff was not selected for an interview because he

ranked eighth out of forty-three.  (*Id.* and Ex. I.)

### Application Ranking and Selection for Interviews

MacLennan believed that license experience—i.e. the experience

performing the position itself—would be a tremendous asset, and that any

similar, overlapping and/or closely related experience would also be helpful.

(MacLennan Aff. ¶ 12.)  Accordingly, she ranked the applicants as follows with

respect to the category of license experience:

- W.S. received 25 points because she had been working on a temporary basis in the License Center, and she also had over a decade of license experience, including license transfers. (*Id.* ¶ 14.)  These facts were supported by the content of her application.  (*Id.*)

- L.M. received ten points for license experience, because she had been working for over nine years in the Clerk II classification in the Recorder's Department, which was work experience in a related field, in part because the offices deal with overlapping records.  (*Id.* ¶ 15.)

- M.F. received 10 points for license experience because she had worked in the License Center as a clerk for over ten years, from July 1985 to May 1996.  (*Id.* ¶ 16.)

All but one of the remaining forty applicants, including Ries, received

0 points for license experience.  Ries' application showed neither license

experience nor work in what MacLennan considered to be a related field.

(*Id.* ¶ 17.)  Given that thirty-nine applicants received 0 points, MacLennan

viewed "related experience" as experience that was closely related.

With respect to the "money handling" category, of the 15 available points, ten points were available for cashier transaction experience and five points were available for banking/deposits. (*Id.* ¶ 18.)   The "Classification Description" for the license clerk II position expressly listed as "examples of duties" working with "cash, checks, and receipts."  (Holte Aff. at Ex. B.)  Thus, MacLennan was looking for experience with cash register, counting money, and the like. (MacLennan Aff.  ¶ 12.)  In reviewing the application materials, she was looking for information indicating that an applicant had teller experience, worked in a public or a private service organization, or retail, with cashier or teller work or money-exchange experience.  (Rice Supp. Aff., Ex. D at 43 – 44.)  MacLennan ranked applicants as follows:

- W.S. received the full 15 points, based on her description of her work with the temporary agency, Kelly (i.e., the License Center placement), and on her dealership experience, described in her application and attachments.  At the dealership, W.S. had to collect state sales tax, license title fees and transfer moneys, and take applications, cash and checks to the License Center for processing. (MacLennan Aff. ¶ 19.)

- L.M. received 15 points based on her stated experience in the Recorder's Office, which takes substantial fees for recording, and as a bank teller.  (*Id.* ¶ 20.)

- M.F. received 15 points based on her stated experience in the License Center, requiring cash-handling, as a retail coworker/shift lead at KwikTrip, where MacLennan had observed her work the cash register, and at Fastenal.  (*Id.* ¶ 21.)

Plaintiff received 0 points for "money handling" experience based on the content of the resume that he attached to his application.  (*Id.* ¶ 22.)  In reviewing

his resume, MacLennan did not spot what she thought was cashier transaction or banking/deposit experience. (*Id.*) She did not conclude from Plaintiff's "merchandise supervisor" entry that his position at Wal-Mart included cashier or money experience, and she saw nothing to indicate he handled cash or had banking/deposit experience. (*Id.*) She indicated that based on her experience with Wal-Mart, the floor employees who assist the customers do not take the customer's money; only those Wal-Mart employees who are actually standing behind the cash register, acting as cashiers, accept customer money. (Rice Supp. Aff., Ex. B at 16 – 17.) Plaintiff's resume did not indicate that he worked as a cashier at Wal-Mart. (Holte Aff., ¶ 16, Exs. G and H.) In his deposition, Plaintiff testified that some Wal-Mart "sales associates" wait on customers and stock merchandise, but do not handle money or run the cash register. (Rice Aff., Ex. A at 25 – 26.)

With respect to other job criteria, Plaintiff scored the highest possible scores in the categories of Customer Service, Communication and Veteran Status, and received 20 of 25 points in the category of Computers. (MacLennan Aff. at Ex. I.)

After completing the scoring process, MacLennan delivered the completed point spreadsheet with the applicants' scores to Holte, who spot-checked them to a sampling of applications. (Holte Aff. ¶ 8.) Holte found no problems, discrepancies or issues with MacLennan's scoring, and therefore upheld them. (*Id.* ¶ 11.)

Consistent with Defendant's practice at the time, MacLennan then determined the score cutoff point for interviews, and chose the top three candidates—all of whom she considered outstanding—to be interviewed.  (*Id.* ¶ 12; MacLennan Aff. ¶ 25, Rice Supp. Aff., Ex. D at 44.)  Because Plaintiff ranked eighth out of 43 he was not interviewed.  (MacLennan Aff. ¶ 13, Ex. I.)  Mary Maloney and an employee from the personnel department conducted the interviews.  (Rice Supp. Aff, Ex. D at 45.)  Each applicant interviewed was asked the same questions.  (*Id.* at 48 – 49.)  Following the interviews, it was determined that W.S. was best qualified and would be offered the position.  (Holte Aff. ¶ 13; Rice Supp. Aff., Ex. D at 45 – 46.)   MacLennan was unaware of Plaintiff's age during the application process.  (MacLennan Aff. ¶ 27.)  And neither Holte nor MacLennan considered age or gender in any decision made in connection with this process.  (Holte Aff. ¶ 14; MacLennan Aff. ¶ 27.)

**Plaintiff's Appeals Board Review, EEOC Charge, and Federal Action**

When Plaintiff complained that he was not hired, he was told to participate in the grievance process before the Personnel Appeals Board.  (Rice Supp. Aff., Ex. A at 65 – 66.)  Plaintiff did so, arguing that he had been discriminated against based on age, sex and veteran status.  (Holte Aff. ¶ 22, Exs. R and S.)  The Board members were neither officers nor employees of Defendant.  (*Id.*)  After a full evidentiary hearing, where Plaintiff was allowed to present evidence, testify, call and cross examine witnesses, and make a closing argument, the Board

deliberated and issued its Findings, Report and Recommendations upholding Defendant's hiring decision.   (*Id.* Ex. S.)

Plaintiff then filed a charge with the EEOC, which dismissed his claims after investigation.  (Rice Aff. at Ex. H.)  On March 9, 2010, the EEOC issued Plaintiff a right-to-sue-letter.  (*Id.*)  Plaintiff then filed suit in federal court on April 21, 2010, alleging that Defendant discriminated against him on the basis of his gender, age, and veteran status.   (Doc. No. 1.)  On August 31, 2010, Plaintiff's discrimination claim on the basis of veteran status was dismissed. (Doc. No. 44.)  The parties now cross-move for summary judgment.  (Doc. Nos. 67 and 81.)

## DISCUSSION

### I.    Standard of Review

Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The Court must view the evidence, and the inferences that may be reasonably drawn from the evidence, in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  But as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 256 (1986). The parties have cross-moved for summary judgment, agreeing that only issues of law remain for decision.

## ANALYSIS

### I.  Reverse Sex Discrimination under Title VII

Title VII prohibits an employer from discriminating against an employee on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Plaintiff contends that Defendant unlawfully discriminated against him because he is male. He presents no direct evidence of sex discrimination, and the parties agree that the burden-shifting framework outlined in *McDonell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to the summary judgment analysis in this case. Under this framework, if a plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the adverse employment action. *McDonell Douglas*, 411 U.S. at 802. If the employer meets this burden, the

11

presumption of discrimination drops from the case, and the burden shifts back to

Plaintiff to show that the proffered reason is merely a pretext for discrimination,

and the true reason is his gender.  *Id.* at 804-85.

### A.   Prima Facie Case

To establish a prima facie case of disparate treatment under Title VII,

Plaintiff must demonstrate:  (1) that he was a member of a protected group; (2)

that he was qualified for the position sought; (3) that he suffered an adverse

employment action; and (4) circumstances exist that create an inference of

discrimination.  *Sallis v. Univ. of Minn.*, 408 F.3d 470, 475-76 (8th Cir. 2005);

*Wheeler v. Aventis Pharms.*, 360 F.3d 853, 857 (8th Cir. 2004).   "A plaintiff

establishes a prima facie case in a 'failure to hire' case when he proves that (1)

he is a member of a protected class; (2) he was qualified for the position for

which the employer was accepting applications; (3) he was denied the position;

and (4) the employer hired someone from outside the protected class."   *Arraleh*

*v. County of Ramsey*, 461 F.3d 967, 975 (8th Cir. 2006) (citing *Kobrin v. Univ. of*

*Minn.*, 34 F.3d 698, 702 (8th Cir. 1994)).

Further, in a reverse discrimination case such as this, the Eighth Circuit

also requires the plaintiff to show that "'background circumstances support the

suspicion that the defendant is that unusual employer who discriminates against

the majority.'"  *Hammer v. Ashcroft*, 383 F.3d 722, 724 (8th Cir. 2004) (quoting

*Duffy v. Wolle*, 123 F.3d 1026, 1036 (8th Cir. 1997); *Woods v. Perry*, 375 F.3d

671, 673 (8th Cir. 2004) (same).   A plaintiff can show suspicious background

12

circumstances by showing evidence that the defendant is "inclined to discriminate invidiously against males or something 'fishy' about the facts that raises an inference of discrimination." *Woods,* 375 F.3d at 674.  As in any employment discrimination case, the ultimate burden of persuasion remains at all times with the plaintiff.  *Id.*

 Here, even assuming that Plaintiff can demonstrate that he was qualified for the license clerk position—which Defendant disputes—there is no evidence in the record to support an inference of discrimination against men or to establish that Defendant is the unusual employer that discriminates against men.  As a result, Plaintiff has not met his burden of establishing a prima facie case of discrimination.

### 1.    Plaintiff's Statistical Evidence

Plaintiff offers generic demographic evidence that Defendant has not hired any male applicants during the two-year period spanning from 2006 to 2008, suggesting that these hiring statistics alone serve as evidence of Defendant's discriminatory animus toward males.  This Court disagrees.

To establish prima facie inference of discrimination, it is not enough to only show that a workplace, or a particular job, was predominated by one sex.  *See Ladd v. Mohawk Carpet Distr.*, L.P., No. Civ. 08-6470 (JNE/JJG), 2010 WL 2541651, at *11–12 (D. Minn. April 1, 2010) (finding no prima facie inference of discrimination where statistical evidence showed that of the forty-seven sales representatives employed by Defendant only three are women, and Plaintiff

presented no other proof that Defendant engaged in discriminatory practices or promoted gender disparity), *report and recommendation adopted by Ladd v. Mohawk Carpet Distr. L.P.*, No. Civ. 08-6470 (JNE/JJG), 2010 WL 2540702 (D. Minn. June 17, 2010); *Wittenburg v. Am. Expr. Fin. Advis., Inc.*, 464 F.3d 831, 841 (8th Cir. 2006) (finding no inference of animus where only proof was that two of 26 employees in a certain job were women).

Plaintiff's statistical information regarding Defendant's past hires does not demonstrate that similarly situated male applicants were treated less favorably, and also does not support an inference that something "fishy" is going on at Defendant's licensing department relating to the treatment of males.  *See Kent v. Iowa*, 651 F. Supp. 2d 910, 952 (S.D. Iowa 2009) (rejecting plaintiffs' reliance on generalized statistical evidence and finding that "Plaintiffs' statistical averages do not demonstrate that similarly situated employees outside the protected class were treated more favorably, nor do they support an inference that something 'fishy' is going on at NCF regarding the treatment of males versus females" for the purposes of reverse discrimination analysis) (internal quotations omitted).

Further, Plaintiff's observation that Defendant has not hired a male during the 2006–2008 period is virtually meaningless.   Among other things, he presented no information about the proportion of qualified males in the relevant applicant pool.  Such information would be required to show whether the number of female applicants hired was disproportionate to their number in the relevant applicant pool.   Defendant, on the other hand, did submit helpful statistical data

14

accompanied by the appropriate analytical foundation set forth in the expert

report of Dr. Sharon Kelly, a recognized expert in the area of statistics.   (Doc.

No. 75, Affidavit of Sharon Kelly ("Kelly Aff."), Ex. D.)  Between 2006 and 2008,

there were five postings for the license clerk position by Defendant:

> June 27, 2006 posting:  **58 applicants**; **4 male**, **54 female**.
> May 11, 2006 posting:  **35 applicants; 4 male, 31 female**.
> March 28, 2006 posting:  **64 applicants, 5 male, 59 female**
> March 1, 2006 posting:  **4 applicants, 0 male, 4 female**.
> September 26, 2008 posting:  **43 applicants, 8 male, 35 female**.

(*Id.*, Ex. C at 5-15 and Ex. D.)  Defendant made no hires from the March 28,

2006 applicant pool, and hired a female from each of the remaining four job

postings.  (*Id.*)  Dr. Kelly conducted the two-tail analysis and the Fisher's Exact

test.  (*Id.* at Ex. D.)  The Fisher's Exact test is used to calculate the probability

that the number of individuals of a particular race or gender selected for a certain

job classification would be the same as the number actually selected, if the

selection were independent of race or gender.  (*Id.*)  Where, as here, the sample

size is relatively small "[t]he Fisher's Exact is the most appropriate form of

statistical analysis to use."  *Jones v. Pepsi-Cola Metro. Bottling Co.*, *Inc.*, 871

F.Supp. 305, 311 (E.D. Mich. 1994) (citing *Bridgeport Guardians, Inc. v. City of

Bridgeport*, 735 F.Supp. 1126, 1131–32 (D. Conn. 1990).  The level of statistical

significance rises as the value of probability level declines.  A probability below

.05 is generally considered to be statistically significant, i.e., when there is less

than a 5% probability that the disparity was due to chance.  (Kelly Aff. at Ex. D.)

Statistical significance at a level in the range below 0.05 is basically equivalent to

significance at the two or three standard deviation level.  (*Id.*); *See also*

*Castaneda v. Partida,* 430 U.S. 482, 497 n.12 (1977) (noting general rule that

standard deviations greater than two or three necessarily exclude chance as a

cause of underrepresentation).  Here, the probability equaled to 1.0, which is

substantially less than two standard deviations, and statistically insignificant.

(Kelly Aff. at Ex. D.)  Simply put, Defendant's hiring practices were consistent

with what would be expected in a gender-neutral hiring process, given the gender

of the applicants.  Dr. Kelly concluded:

> I find no statistical support for the allegation that the hiring selections
> in Winona County were adverse with respect to men.  Each posting
> that I analyzed showed no statistically significant differences
> between the number of men I would predict to be hired from the
> applicant pool and the number actually selected.  When the postings
> are analyzed as a group I see no pattern of under-selection of men
> for the clerk position in the License Center of Winona County.

(*Id.*)

### 2.    Defendant's Scoring Process

This Court also cannot infer discrimination against men from Defendant's

scoring system or the scoring of Plaintiff's application.  As discussed below—in

the context of Plaintiff's failure to show pretext—Defendant's scoring system was

necessary to evaluate applicants' experience and select those most suitable for

the license clerk II position.  There is no evidence that Defendant's hiring process

was arbitrary or subjective, let alone that it disfavored men.  In fact, Defendant

was unaware of the applicants' demographics when it identified the applicable

categories for scoring and developed the scoring matrix.   To the extent that

Defendant placed a premium value on license experience and money handling in evaluating and scoring the applicants, this Court cannot infer any discrimination against men from that business decision.  And there is no evidence that Defendant gave Plaintiff fewer points under the license-experience and money-handling categories because of his gender.  Indeed, most applicants, including most female applicants, scored no points under the license-experience category, and numerous applicants did poorly in the money-handling category.   In sum, because Plaintiff presented no evidence based on Defendant's scoring process to establish an inference of discrimination against men, or that Defendant "is that unusual employer who discriminates against the majority" he has failed to establish his prima facie case, and Plaintiff's case may be dismissed for that reason alone.

## B.    Legitimate Non-Discriminatory Reason and Pretext

But even assuming Plaintiff could show that Defendant "is the unusual employer who discriminates against men," he still bears the burden of showing that Defendant's stated reason for its interview and hiring decisions was pre-textual.  *See Woods*, 375 F.3d at 676.  This he cannot do.

Because Defendant proffered a legitimate, non-discriminatory reason for not interviewing or hiring Plaintiff, any presumption of discrimination disappears. *Ramlet v. E.F. Johnson Co.*, 507 F.3d 1149, 1153 (8th Cir. 2007); *Johnson v. AT &T, Corp.*, 422 F.3d 756, 763 (8th Cir. 2005).  Thus, Plaintiff can avoid summary judgment only if he demonstrates that Defendant's proffered stated reason for its

interview and hiring decisions—that other candidates were more qualified for the license clerk II position—was pre-textual.  *Johnson*, 422 F.3d at 763.  Plaintiff has offered no evidence that the Defendant did not actually prefer the qualifications possessed by the successful applicants over those possessed by Plaintiff.

### 1.      Defendant's Scoring Process

This Court finds that Defendant's scoring process was not a pretext for discrimination.   Ultimately, Plaintiff's complaints about Defendant's scoring boil down to nothing more than an attack on Defendant's business practices.   But "the employment discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Hutson v. McDonnell Douglas Corp.,* 63 F.3d 771, 781 (8th Cir. 1995); *Day v. Johnson*, 119 F.3d 650, 657 (8th Cir. 1997) ("[F]ederal courts are not self-appointed personnel managers, and they may not second-guess the fairness or wisdom of an employer's nondiscriminatory employment decisions").   Indeed, Title VII prohibits intentional discrimination based on certain classifications—not "employment decisions based on other factors, such as job performance, **erroneous evaluations**, personality conflicts, or even **unsound business practices**."  *Rose-Maston v. NME Hosp. Inc.*, 133 F.3d 1104, 1108-1109 (8th Cir. 1998) (emphasis added).

Thus, in determining whether an employer's justification for not hiring an employee is pretextual, this Court does not examine whether an employer's reason for that decision was a correct business judgment but rather whether it honestly acted on that reason.  *See McKay v. U.S. Dep't of Transp.*, 340 F.3d 695, 700 (8th Cir. 2003) (stating that "pretext inquiry is limited to whether the employer gave an honest explanation of its behavior, not whether its action was wise, fair or correct"); *Tanner v. Entergy Arkansas*, No. 08cv99, 2009 WL 1955232, at *4 (E.D. Ark. July 6, 2009) ("[T]he proper inquiry is not whether Entergy was factually correct in determining that Walker's company had a history of poorly performing work for Entergy; rather the proper inquiry is whether Entergy honestly believed that Walker had such a history.").  Here, there is nothing to cast doubt on Defendant's reasons for not hiring Plaintiff.

Defendant followed its hiring protocol by preparing a point system after identifying relevant categories for scoring purposes, preparing a uniform set of questions, scoring the applications, and interviewing the top three scoring candidates.   Notably, when MacLennan prepared the scoring matrix and identified the applicable categories for scoring, she did not know anything about the demographics of the applicant pool.   Applicants were scored according to the point system, and those with the highest scores were chosen for interviews.  Plaintiff scored well—eighth out of forty applicants—but not enough to be one of three top candidates interviewed.  Although Plaintiff disagrees with Defendant's scoring system and some of the scores, his disagreement is grounded in his

subjective opinion about "best practices" for hiring—not anything that evinces

gender discrimination.[2]   For example, he believes that he should have been

awarded points in the "Money Handling" category because he took some

accounting courses, had some prior budgeting experience, and worked as a

"Merchandise Supervisor" at Wal-Mart.   Notably, ten applicants, including

Plaintiff were awarded no points in that category and eight other applicants

scored only five points out of the possible fifteen.   Thus, many other applicants

scored poorly in that category.

Plaintiff also disagrees with MacLennan's decision to look for someone

with cashier experience, because he believes that accounting skills and

responsibility for budgets are more important for a license clerk position.   But it is

---

[2]   Plaintiff submitted a document with his own unsworn "expert testimony" in support of summary judgment, appearing to suggest that he is an "expert" in best hiring practices.  (Doc. No. 69 at 18-20 of 55.)  Defendant argues that his "expert testimony" is inadmissible for summary judgment purposes because, among other things, Plaintiff does not have the qualifications necessary to render an opinion in this matter, and his opinions are neither reliable nor relevant pursuant to Federal Rule of Evidence Rule 72 and *Daubert v. Merrell Dow Pharms*, 509 U.S. 579 (1993).  This Court need not reach the merits of Defendant's argument because, even if the Court were to consider Plaintiff's expert testimony, his opinions are insufficient to create an issue of material fact to defeat Defendant's summary judgment motion.  *See Delgado-O'Neil v. City of Minneapolis*, 745 F. Supp. 2d 894, 910 (D. Minn. 2010) ("The Court need not address the City's motion to exclude, however, because even if the Court admits the Plaintiff's expert report, and viewing the data in Plaintiff's favor—that is aggregating the data for all minorities and all test years—Plaintiff has failed to establish the existence of genuine issues of material fact that the oral examinations had a statistically significant adverse impact based on race"); *Oelhafen v. Skyjack, Inc.*, Doc. No. 01-2121, 2003 WL 25672294, at *12 (D. Minn. July 11, 2003) ("The court does not reach the merits of BMSI's argument because, even if the court were to consider Skyjack's expert testimony, the court finds no issue of material fact exists to defeat BMSI's motion for summary judgment").

not for Plaintiff or this Court to second-guess MacLennan's business judgment about what makes the best Winona County license clerk.   Based on her review of the applications, MacLennan determined that the top three candidates had the relevant money-handling experience, while Plaintiff did not.   MacLennan also concluded that Plaintiff's resume was geared toward a mid-level management position—not a license clerk position—and did not reflect the relevant "Money Handling" experience or skills.   Further, MacLennan believed that license experience—i.e. the experience performing the position itself—would be a tremendous asset, and that any similar, overlapping and/or closely related experience would also be helpful.   Plaintiff did not score any points for license experience.   But neither did the remaining thirty-nine of the forty-three applicants for that position.   As such, these circumstances do not permit any reasonable inference of gender discrimination.

Plaintiff also complains that Defendant "did not even mention the handling of money in the position posting."   This Court disagrees.   Defendant's position posting specifically referred candidates to the "Classification Descriptions. . . available from the Personnel Department. . ."   The "Classification Description" for the license clerk (Clerk II) position, which was provided to Plaintiff in the application packet, expressly listed as "examples of duties" working with "cash, checks, and receipts."   (Holte Aff. at Exs. B and C; Rice Supp. Aff., Ex. D at 29–32.)   Plaintiff, like any other candidate, had access to this document.   It was his

responsibility to highlight any experience or proficiency in the areas demanded or suggested by the job description.

Further, it is wholly irrelevant that Plaintiff has more college education than the head of the license clerk department who developed the scoring matrix and description for the license clerk position.   Nor is it relevant that Plaintiff arguably had more years of college education or graduate-level coursework than some of the successful job candidates.  In fact, Plaintiff should have recognized that Defendant was not looking for candidates with extensive college or graduate school education because under the license-clerk II "Classification Description" the only education required was "graduation from high school."  (Holte Aff. at Ex. B.)  As a practical matter, however, job applicants inevitably will have different strengths and qualifications, and the choice of one qualified candidate over another is not sufficient to raise an inference of discrimination or show pretext. *Woods,* 375 F.3d at 675-76; *Duffy,* 123 F.3d at 1038.   For example, Plaintiff was awarded the top possible scores in the categories of Customer Service, Communication and Veteran Status, and received 20 of 25 points in the category of Computers.  But he has not shown that his overall qualifications for the license clerk position were superior to those interviewed or hired.

Plaintiff's attempt to turn Defendant's exercise of appropriate discretion during the applicant-evaluation process into gender discrimination is equally unavailing.  The record makes clear that Defendant had a structured hiring process, with numerous objectively identifiable criteria for its hiring decision.

Further, the existence of subjective components to the hiring process is not unusual.  *See Amini v. City of Minneapolis*, Civ. No. 09-435, 2010 WL 3023274, at *8 (D. Minn. July 28, 2010) (stating that the existence of subjective components in the hiring process does not demonstrate that hiring decisions were discriminatory).

Here, Plaintiff "has not pointed to record evidence that casts doubt on the justifications offered by [Defendant] and therefore any subjective elements in the hiring process do not give rise to an inference of discrimination."  *Id.* (citing *Chambers v. Metro. Prop. and Cas. Ins. Co.*, 351 F.3d 848, 858 (8th Cir. 2003) ("The use of this subjective consideration in this case does not give rise to an inference of discrimination because the plaintiff was unable to cast doubt on the justifications offered by the employer.")).  As stated by the Eighth Circuit: "Identifying those strengths that constitute the best qualified applicant is . . . a role best left to employers."  *Duffy*, 123 F.3d at 1037–38.  As the head of the license department, MacLennan was entitled to place a premium on the knowledge and experience she deemed most applicable to the job, including cashier experience.  And there is nothing to indicate that MacLennan's conclusion that Plaintiff had no cashier experience despite his "merchandise supervisor" position at Wal-Mart was motivated by unlawful gender discrimination.   As discussed above, many applicants scored no or very few points in that field.

Finally, Plaintiff's statistical evidence that Defendant hired no males for the license clerk position during the 2006–2008 hiring period is insufficient to establish pretext.  As discussed above, there is no evidence that Defendant's hiring practices were inconsistent with what would be expected in a gender neutral hiring process, given the gender of the applicants.  And Plaintiff presents no other independent evidence supporting pretext.   *Tanner*, 2009 WL 1955232, at *4 (stating that statistical evidence alone is insufficient for a finding of pretext and dismissing plaintiff's claim because he presented no independent evidence supporting pretext); *Bogren v. Minnesota*, 236 F.3d 399, 406 (8th Cir. 2000) (finding statistical evidence that plaintiff was the only black woman employed by defendant is insufficient proof of pretext where there are no other independent grounds to cast doubt on employer's legitimate reason for its adverse decision) (citing cases); *cf. O'Sullivan v. Minnesota*, 191 F.3d 965, 969-70 (8th Cir. 2000) (finding that animus could not be inferred from the fact that no women were on executive committee).  For example, Plaintiff presents no evidence that qualified male applicants applied for the license clerk II position and were rejected during the 2006-2008 hiring period.  That Defendant hired female applicants during those years may simply reflect the available work force applicant pool for the license clerk II position.  Regardless, there is no evidence from which a reasonable fact finder could disbelieve Defendant's nondiscriminatory explanation for not hiring Plaintiff.

## II.    Plaintiff's ADEA Claim

This Court finds that Plaintiff's ADEA claim shares many of the same failings as his claim for gender discrimination.  The ADEA prohibits employers from refusing to hire an applicant because of his age.  *See* 29 U.S.C. § 623(a).  The Supreme Court recently held that the ADEA requires a plaintiff "to establish that age was the 'but-for' cause of the employer's adverse action."  *Gross v. FBL Fin. Servs., Inc.,* ---- U.S. ----, 129 S. Ct. 2343, 2351 (2009).  Where, as here, "the plaintiff presents indirect evidence of discrimination, the court analyzes [his] claim under the burden-shifting framework set forth in *McDonnell Douglas*."  *Tusing v. Des Moines Indep. Cmty. Sch. Dist.*, ---F.3d----, Civ. No. 10-1004, 2011 WL 1364477, *4 (8th Cir. Apr. 12, 2011).  Because Plaintiff has presented no direct evidence of intentional age discrimination, and both parties have applied the *McDonnell Douglas* framework to analyze his claim, this Court analyzes Plaintiff's age discrimination claim under the *McDonnell Douglas* burden-shifting framework.[3]

---

[3]   The Supreme Court had not definitively decided whether the evidentiary framework of *McDonnell Douglas* is appropriate in the ADEA context.  *Gross*, 129 S.Ct. at 2349 n.2.  But numerous Eighth Circuit courts have continued to apply the *McDonnell Douglas* framework to ADEA cases involving indirect evidence. *See Tusing*, 2011 WL 1364477, at *4;  *Rahlf v. Mo. Tech. Corp., Inc.*, 2009 WL 5033955, at *2 (D. Minn. Dec. 15, 2009) (citing *Roberts v. USCC Payroll Corp.*, 635 F. Supp. 2d 948, 962 n. 2 (N.D. Iowa 2009); *Woehl v. Hy-Vee, Inc.*, 637 F. Supp. 2d 645, 651 (S.D. Iowa 2009); *Healy v. Buhrs Americas, Inc.*, Civ. No. 08-304, 2009 WL 3164771, at *4-*5 (D. Minn. Sept. 29, 2009).  Accordingly, this Court will adhere to the Eighth Circuit precedent, as it must, which follows *McDonnell Douglas* in ADEA indirect evidence cases.

To establish a prima facie case in a failure-to-hire case under the ADEA, the "plaintiff must prove following: (1) that the plaintiff was in the protected age group (over forty); (2) that the plaintiff was otherwise qualified for the position; (3) that the plaintiff was not hired; and (4) that the employer hired a younger person to fill the position." *Wingate v. Gage Cnty Sch. Dist.*, 528 F.3d 1074, 1079 n.3 (8th Cir. 2008) (citation omitted).  Here, even assuming Plaintiff has established a prima facie case of age discrimination, he cannot demonstrate that he was not interviewed or hired because of his age.  As with Plaintiff's claim of gender discrimination, this Court finds that Defendant has provided a non-discriminatory, legitimate reason for not interviewing or hiring Plaintiff.  Once the employer provides a non-discriminatory reason, "the presumption of discrimination disappears, and the plaintiff can only avoid summary judgment if he presents evidence that considered in its entirety: (1) creates a question of material fact as to whether the defendant's proffered reasons are pretextual and (2) creates a reasonable inference that age was a determinative factor in the adverse employment decision." *Korht v. MidAmerican Energy Co.*, 364 F.3d 894, 897 (8th Cir. 2004) (quotations and citations omitted).  To survive summary judgment by showing pretext, Plaintiff must show that Defendants' reason was false and that age was the real reason he was not interviewed or hired.  *See id.* at 898. This he cannot do.

As discussed above, Defendant provided a legitimate nondiscriminatory reason for not hiring Defendant based on his lack of qualification for the license

clerk position in the areas of license experience and money handling.  Defendant has offered no evidence to cast doubt on the sincerity of Defendant's business decision.

To overcome the employer's proffered legitimate reason, the employee must do more than assert that a jury might disbelieve the employer's proffered reason; rather, he "must present affirmative evidence." *Walton v. McDonnell Douglas Corp.*, 167 F.3d 423, 428 (8th Cir. 1999) (citing *Anderson*, 477 U.S. at 257).  First, there is no evidence that Defendant was even aware of Plaintiff's age when it scored his application.  Second, Plaintiff provides scant affirmative evidence that age was the reason he was not interviewed.  In fact, the only affirmative evidence Plaintiff points to is that Defendant ultimately hired WS—a person under forty—instead of him for the license clerk II position.   But this evidence alone, while necessary to establish a prima facie case, is not enough to create a reasonable inference of discrimination or to show pretext.  *See Carraher v. Target Corp.*, 503 F.3d 714, 719 (8th Cir. 2007) (stating that plaintiff was replaced by a substantially younger person possesses insufficient probative value to persuade a reasonable jury that plaintiff was discriminated against); *Thomas v. Corwin*, 483 F.3d 516, 529 (8th Cir. 2007) (granting summary judgment where plaintiff presented no evidence other than her replacement by a younger woman).

Third, Plaintiff contends that Defendant never hired anyone over the age of 55 between 2006 and 2008.  That is incorrect.  In fact, Defendant hired two 58-

year old applicants, one 49-year-old applicant and only one 37-year-old applicant

for the license clerk II position from the four job postings during that period.

Thus, three of the four license-position hires were in Plaintiff's protected class

under the ADEA.  And two of those individuals were only eight years younger

than Plaintiff—an insignificant age disparity for the purposes of the ADEA.

*Girten v. McRentals, Inc.,* 337 F.3d 979, 982 (8th Cir. 2003) (holding that "[t]he

nine-year age difference between [one of the plaintiffs] and his replacement may

not be sufficient to infer age discrimination."); *Wittenburg*, 464 F.3d at 840

(holding that the successful candidate was not "substantially younger" than

plaintiff where the age disparity was six years).  Regardless, Defendant's hiring

of some license clerks younger than Plaintiff, standing alone, does not create an

inference that Defendant discriminated against him on the basis of his age.

*Tusing*, 2011 WL 1364477, at *5.

Finally, as discussed above, there is no evidence of discrimination in the

manner that Plaintiff's application was scored.  Like Title VII, the ADEA does "not

prohibit employment decisions based upon . . . erroneous evaluations . . . or

even unsound business practices."  *Hill v. St. Louis Univ.*, 123 F.3d 1114, 1120

(8th Cir. 1997) (finding insufficient evidence presented by employee to show

pretext); *Day*, 119 F.3d at 657 ("federal courts are not self-appointed personnel

managers, and they may not second-guess the fairness or wisdom of an

employer's nondiscriminatory employment decisions").   That Plaintiff, like many

other applicants, did not score higher in the license and money-handling category

does not suggest age discrimination.   Plaintiff submitted no evidence suggesting

that he was more qualified for the license clerk II position than the individuals

interviewed and hired.   Even if Defendant's assessment of Plaintiff's

qualifications were inaccurate, that would not establish that their reason for not

interviewing him was false or insincere.   And, as noted above, under the ADEA,

age must be the "but-for" cause of the employer's decision.   *Gross*, 129 S.Ct. at

2351.   Therefore, "proof that the explanation is false is necessary, but not

sufficient, to show a pretext for discrimination under the ADEA.   In other words,

the plaintiff must show that the employer's stated reason was false and that age

discrimination was the real reason.   *Tusing*, 2011 WL 1364477, at *4 (citing

*Dixon v. Pulaski Cnty. Special Sch. Dist.*, 578 F.3d 862, 872–73 (8th Cir. 2009);

*Kohrt*, 364 F.3d at 897–98).   Here, Plaintiff cannot show that Defendant's reason

for not interviewing him was false, or that that age discrimination was the "but-for"

cause of its decision not to interview or hire him as a license clerk.   Accordingly,

this Court recommends that Plaintiff's ADEA claim for age discrimination be

dismissed.

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.    Defendant's Motion for Summary Judgment (Doc. No. 81) be

**GRANTED**;

2.    Plaintiff's Motion for Summary Judgment (Doc. No. 67), be **DENIED**;

and

3.      This case be **DISMISSED WITH PREJUDICE.**

Dated:  May 6, 2011                             _/s Jeffrey J. Keyes_____
                                                JEFFREY J. KEYES
                                                United States Magistrate Judge

Under Local Rule 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **May 20, 2011,** a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within **fourteen days** after service thereof.  All briefs filed under this rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions of the Report to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within **ten days** of receipt of the Report.